KBHKYOUN

1  UNITED STATES DISTRICT COURT
   SOUTHERN DISTRICT OF NEW YORK
2  ------------------------------x

3  UNITED STATES OF AMERICA,

4            v.                          18 CR 262 (VEC)

5  FABIO SIMON YOUNES ARBOLEDA,

6            Defendant.

7  ------------------------------x

8                                   New York, N.Y.
                                    November 17, 2020
9                                   12:40 p.m.

10 Before:

11              HON. VALERIE E. CAPRONI,

12                                        District Judge

13
                        APPEARANCES
14

15 AUDREY STRAUSS,
        Acting United States Attorney for the
16      Southern District of New York
   KYLE WIRSHBA
17      Assistant United States Attorney

18 DONALD YANNELLA
        Attorney for Defendant
19

20 ALSO PRESENT:  LISA CHAN, Pretrial Services

21

22

23

24

25

1     (Case called)

2     MR. WIRSHBA:  Good afternoon, your Honor.  Kyle

3  Wirshba, on behalf of the government.

4     THE COURT:  Good afternoon.

5     MR. YANNELLA:  And for Mr. Younes, Donald Yannella.

6  Good to see you, your Honor.

7     THE COURT:  Good afternoon, Mr. Yannella.  Good to see

8  you.

9     Good afternoon, Mr. Younes.

10     THE DEFENDANT:  Good morning.

11     THE COURT:  Please be seated.

12     This is the first appearance of this defendant in this

13  case before me, so the new Rule 5(f) requires me to warn the

14  prosecutor of his *Brady* obligations.

15     So as I am required to do, I remind the government of

16  its obligations under *Brady v. Maryland* and its progeny to

17  disclose to the defense all information, whether admissible or

18  not, that is favorable to the defendant, material either for

19  guilt or punishment, and known to the government.  The

20  government must make good-faith efforts to disclose such

21  information to the defense as soon as reasonably possible after

22  its existence becomes known to the government.

23     As part of these obligations, the government must

24  disclose information that can be used to impeach the trial

25  testimony of a government witness within the meaning of *Giglio*

1  *v. United States* and its progeny, and must do so sufficiently

2  in advance of trial in order for the defendant to make

3  effective use of it at trial.

4         I remind you that these obligations are continuing,

5  and they apply regardless of whether you credit the

6  information.

7         For these purposes, the government includes any

8  federal, state, and local prosecutors, law enforcement

9  officers, and other officials who have participated in the

10  investigation of the events underlying the charges in this

11  case.  It applies to anyone who has participated in the

12  prosecution of the charged offenses, whether such officials are

13  still part of the prosecution team or not, and that you have an

14  affirmative obligation to seek from those sources all

15  information that is subject to disclosure.

16         Finally, I caution the government that if it fails to

17  comply with this order, any number of consequences may follow.

18  I may order production of the information and specify the terms

19  and conditions of such production, or grant a continuance, or

20  impose evidentiary sanctions, or sanction any lawyer

21  responsible for the noncompliance, or dismiss charges before

22  trial, or vacate a conviction after trial or guilty plea, or

23  any other such order that is just under the circumstances.

24         Mr. Wirshba, do you understand these obligations and

25  confirm that you have fulfilled or will fulfill them?

1     MR. WIRSHBA:  Yes, your Honor.  We understand the

2  obligations, we have and will fulfill them, and we take them

3  extraordinarily seriously.

4     THE COURT:  Terrific.

5     Consistent with Rule 5(f), I have previously entered a

6  written order in this case confirming the government's *Brady*

7  obligations.

8     So the next step is to arraign Mr. Younes.

9     Mr. Younes, have you seen a copy of the indictment in

10  this case, which is numbered 18 CR 262?

11     THE DEFENDANT:  (In English) Yes.

12     THE COURT:  Has someone read the indictment to you?

13     THE DEFENDANT:  When I came to this country?

14     THE COURT:  Yes.

15     THE DEFENDANT:  Yes.

16     THE COURT:  Can you read English?

17     THE DEFENDANT:  My English is broken.  I speak a

18  little English.

19     THE COURT:  Do you read English?

20     THE DEFENDANT:  Yes.

21     THE COURT:  Okay.  Has someone read the indictment to

22  you?

23     MR. YANNELLA:  Judge, may I make a record?

24     THE COURT:  Sure.

25     MR. YANNELLA:  I wasn't --

1    THE COURT:  Do you want to pull the mic closer to you?

2    MR. YANNELLA:  Oh, yes.  I had moved it when we were

3  talking earlier.

4    I wasn't the CJA attorney at presentment; I was

5  substituted in because that attorney was leaving the panel.

6    THE COURT:  Okay.

7    MR. YANNELLA:  So I have not formally reviewed the

8  indictment with my client, although I did discuss with him the

9  nature of the charges.  I think that the former CJA attorney,

10  at presentment, discussed the indictment with Mr. Younes, and

11  he came here on extradition proceedings from Colombia, but I

12  just want to make a record that I haven't done what I would

13  normally do in a case.

14    THE COURT:  Okay.

15    MR. YANNELLA:  I assumed he got arraigned when he got

16  presented, but, apparently, that is not the case.  I'm sorry.

17    THE COURT:  I'm not sure if he has been arraigned, but

18  I'm going to arraign -- I see my clerk shaking her head, so I

19  think the answer is no.

20    Mr. Younes, you're charged in three counts.  You're

21  charged with conspiracy to import cocaine into the United

22  States, and you're charged with two separate counts of

23  attempting to import cocaine into the United States.

24    Do you waive a public reading of the indictment?

25    THE DEFENDANT:  (In English) Yes.

1          THE COURT:  How do you plead, guilty or not guilty?

2          MR. YANNELLA:  Not guilty.

3          THE DEFENDANT:  Not guilty.

4          THE COURT:  Mr. Wirshba, where are we on discovery in

5    this matter?

6          MR. WIRSHBA:  Your Honor, the government has produced

7    discovery to other defendants in this matter, and so already

8    has much of it prepared.  The government would request two

9    weeks to produce discovery in this matter.  There are certain

10   items of individual discovery that the government is

11   collecting.  I have spoken with defense counsel, and we believe

12   we will be able to make that production within two weeks.  Some

13   of the data that needs to be produced may be housed in Miami,

14   and so we will work to get that expeditiously.  That's where

15   the agents are in this case.

16          If it is the case that the government requires

17   additional time than those two weeks, I'll speak with defense

18   counsel, and we'll, of course, make an application to the

19   Court.

20          THE COURT:  Great.  So discovery is due within two

21   weeks.

22          What's the story on the defendant,

23   Mr. Hernandez-Solarte, is he pending extradition?

24          MR. WIRSHBA:  He is not pending extradition, your

25   Honor.  He is at large, potentially in Colombia, potentially in

1    Venezuela.

2         THE COURT:  Okay.  Because he's at large, the Speedy

3    Trial Clock is not yet running.

4         MR. WIRSHBA:  Correct, your Honor.

5         THE COURT:  I'm assuming the government is still

6    endeavoring to find Mr. Hernandez?

7         MR. WIRSHBA:  We most certainly are, your Honor.  He's

8    indicted in several cases.

9         THE COURT:  Okay.

10        So what I've got scheduled in this case is a status

11   conference for December the 4th, at 2:00 o'clock.  So we'll

12   proceed with that status conference.  That was previously

13   scheduled with the codefendant, Mr. Gomez, I believe.  So we'll

14   proceed with that on December the 4th, at 2:00 o'clock.  That

15   will likely be a telephone conference; in fact, it will most

16   assuredly be a telephone conference.

17        Mr. Yannella, you're going to need to talk to your

18   client and see if he will waive his personal appearance for

19   that status conference.  If he doesn't want to waive

20   appearance, I'm happy to bring him in.  I think he's up at

21   Westchester, so that won't trigger a quarantine for him,

22   depending on what's happening in the world of COVID at that

23   point.  But my plan is to do a telephone conference if he's

24   amenable to not being present.

25        MR. YANNELLA:  Judge, I will review that with him

1    prior to December 4th and advise the Court.

2            THE COURT:  Perfect.  Okay.

3            Mr. Yannella, I understand that you want to make a

4    bail application?

5            MR. YANNELLA:  Yes, your Honor.

6            THE COURT:  You have the floor.

7            MR. YANNELLA:  Okay.

8            Your Honor, I understand that it's a presumption case,

9    but I would respectfully submit that, given the unusual

10   circumstances of this case, the defense can overcome the

11   presumption.

12           First of all, he's 71 years old.  He primarily speaks

13   Spanish, although he speaks broken English.

14           If he were to be released, I would propose that he be

15   permitted to live in Orlando, Florida, with one of his two

16   daughters who live in the United States.  I have provided

17   information about the two daughters, who are also two potential

18   cosigners, to the U.S. Attorney's Office last Friday.  One of

19   the daughters earns $55,000 per year, and she works at a

20   company called Ventsu, V-e-n-t-s-u, and the other daughter

21   earns $45,000 per year, and she works at a company called

22   Mastec, M-a-s-t-e-c.  If he were to be released, my client

23   would propose to live with the second of the two daughters, the

24   one who works at Mastec, M-a-s-t-e-c.  That daughter's name is

25   Kathryn Younes, that's Kathryn K-a-t-h-r-y-n.  She owns her own

1    home in Florida.  She's married.  She and her husband are

2    willing to have Ms. Younes' father come live with them during

3    the pendency of the case.  They have approximately $120,000

4    equity in their home.

5         The other daughter does not own a home, but she's the

6    one who earns slightly more money.  Her name is Paola,

7    P-a-o-l-a, Younes.  She's the one who earns $55,000 a year at

8    Ventsu.  So what I'm proposing is that he be released on the

9    signature of those two cosigners, and that he be permitted to

10   live, perhaps in home detention, at Kathryn Younes' home in

11   Orlando, Florida.

12        This appears to be a somewhat complicated case.  I

13   haven't received discovery yet, but I have read the press

14   release from the U.S. Attorney's Office from two years ago.  It

15   involves FARC, it involves narcotic trafficking.  My client is

16   an individual who has no prior record, either in the United

17   States or in Colombia.  He's 71 years old.  He worked not as a

18   licensed attorney in Colombia, but he worked in some capacity

19   doing legal work in Colombia.  I don't know how it translates

20   exactly because I'm not familiar with the bar requirements down

21   there, but he worked in some capacity in Colombia.

22        There is a lot to discuss here.  He's an individual

23   with health problems.  As indicated in the pretrial services

24   report, he has some kind of blockage involving his heart and

25   involving an artery.  If he were to get COVID-19, it's

1    potentially catastrophic for him, if not fatal.

2           Another issue that I would like to raise is that if he

3    were to be at the Westchester County Jail, it's going to be

4    exceedingly difficult for me to review discovery with him.  And

5    let me explain the difference between the MCC and MDC as

6    opposed to the Westchester County Jail.

7           I've been trying very hard in the past week, since I

8    picked up two Spanish-speaking clients who had both been

9    extradited from Colombia, and both are housed at the

10   Westchester County Jail.  I found out that they have a

11   videoconferencing system, which is apparently the best way for

12   attorneys to consult with their clients, and that's because

13   it's confidential.  When you log onto it, it tells you, this is

14   for attorney-client conversations, it is not being recorded.

15   The problem with that is that you're not allowed to add a third

16   party to it.  So what I had wanted to do was have a Spanish

17   interpreter somehow added to it, but I've been unable to do

18   that in the past four or five days.  Electronically or

19   technologically, they just don't have the capacity to add the

20   third person, and because my client is a Spanish-speaker and

21   speaks only broken English, what I would need to do, based upon

22   my conversations with other CJA attorneys who have

23   Spanish-speaking clients current in the Westchester County

24   Jail, would be to do the videoconference, get an interpreter on

25   my mobile phone, and then hold the mobile phone up to my

1    computer, so that the interpreter could translate.  I'm told

2    the quality is very poor.

3           I did do three or four videoconferences in the past

4    week with my clients who are up there.  There's very little

5    privacy at their end.  In one instance, I had an interpreter --

6    no, not an interpreter, an inmate in the background who could

7    hear what was going on, and he came over and offered to

8    translate, and, of course, I refused to allow that to happen.

9    In another instance — I can't remember if it was the same

10   client — the inmates in the background were suggesting

11   questions for the inmate to ask me as a lawyer.  So the

12   confidentiality -- and this is the good option.  The only other

13   option -- and I have communicated directly with the staff at

14   the Westchester County Jail just to make sure I'm getting this

15   all right, I really tried very hard.  The other option is to do

16   a collect phone call, which I don't mind doing a collect phone

17   call, but they're telling me it's only privileged if it goes to

18   my office, I can't use my mobile phone.  Now, the phone call

19   would be ideal because I could get a Spanish interpreter on the

20   phone, do a three-way call, if I had some assurance that it was

21   privileged.  Although I don't want to do that, I would do it in

22   these circumstances.  That's how I would communicate with him.

23   But, essentially, I have to come to my office in Manhattan in

24   order to do that option, and I haven't been typically doing

25   that, and I probably won't in the months coming up.  I will if

1  I have to, but it really involves travel into Manhattan in

2  order to get a privileged call from my client.

3          So those are the two options.  I don't know if the

4  Court has any influence over the Westchester County Jail.  I

5  have raised this with Bobbi Sternheim, who communicates with

6  the courts regarding issues like this, and I've asked them to

7  raise this at the next meeting, but that's where we stand.

8          So the bottom line is, he's 71 years old, he has

9  health problems, we're probably not headed for a trial anytime

10  soon, because I have murder cases in this district with

11  detained clients, and I was in court yesterday, or virtually in

12  court yesterday, being told that I'm probably not getting a

13  trial date anytime soon.  He's going to be detained for a long

14  time, most likely pending trial.  This is much more difficult

15  than the average case as far as trial preparation, as far as I

16  can tell, although, of course, I'll learn more.  There's every

17  indication that he has a safe and secure place to live.  His

18  daughters will make sure he comes back to court.  Your Honor

19  can use her discretion in determining the amount of the bond or

20  whether any security is necessary, but he's willing to consent

21  to home detention or even home incarceration in Florida.

22          Thank you.

23          THE COURT:  Thank you, Mr. Yannella.

24          Mr. Wirshba?

25          MR. WIRSHBA:  Your Honor, the government believes that

KBHKYOUN

1    detention is appropriate in this case.  As Mr. Yannella

2    acknowledged, this is a presumption case.  And, here, we have a

3    defendant who, in the government's view, is both a risk of

4    flight and a danger to the community.

5         I'll start with danger to the community.  Your Honor

6    is aware of the facts of this case, as this is not the first

7    defendant to come before the Court.

8         THE COURT:  No, but refresh my recollection about what

9    the actual evidence against Mr. Younes is.

10        MR. WIRSHBA:  Yes, your Honor, of course.

11        The evidence against Mr. Younes will show at trial

12   that he participated in a series of meetings in which he agreed

13   with others to provide thousands of kilograms of cocaine,

14   sourced from the FARC, to an individual who claimed to be

15   representing the head of the Sinaloa Cartel.

16        As your Honor is aware, the FARC is a designated

17   terrorist organization, designated by the State Department, and

18   the individual with whom the defendant and others claimed to be

19   coordinating on behalf of the FARC is one of the codefendants,

20   who is Hernandez-Solarte, who's better known as Jesus Santrich.

21        THE COURT:  And your information is that Hernandez is,

22   in fact, a member of the FARC?

23        MR. WIRSHBA:  Your Honor, Mr. Hernandez-Solarte was a

24   leader of the FARC before there was a peace accord between the

25   FARC and the Colombian government.  He wasn't on the highest

1    governing body of the FARC; he was on the second highest

2    governing body.  He participated in the negotiations with the

3    Colombian government.  Ultimately, he was to be named a senator

4    in Colombia, but when this case came to light, he, as others

5    had in the FARC, who had already demobilized from the FARC,

6    chose to run, and he is currently at large, being sought by

7    both Colombian and U.S. authorities.

8            And I will mention, your Honor, that that individual

9    has also been named in another indictment, charging Nicolás

10   Maduro and others in the Venezuelan regime, of coordinating

11   with the FARC and transporting hundreds of thousands of

12   kilograms of cocaine.

13           THE COURT:  I guess what I was trying to confirm was,

14   during the course of the meetings where they were -- where

15   Mr. Younes thought that he was brokering a cocaine transaction

16   between the FARC and the Sinaloa Cartel, the person he was

17   dealing with as the FARC representative was Mr. Hernandez, who

18   the government has reason to believe was, in fact, a member of

19   the FARC, as opposed to someone who was holding himself out as

20   FARC, but wasn't in fact?

21           MR. WIRSHBA:  I see, your Honor.  Yes, that is

22   absolutely correct.

23           THE COURT:  Okay.

24           MR. WIRSHBA:  And, your Honor, the defendant

25   participated in meetings in which thousands of kilograms of

1  cocaine was discussed, and, ultimately, the defendant

2  participated in a meeting in which a sample of that cocaine,

3  five kilograms of cocaine, was provided to the purported

4  representatives of the Sinaloa Cartel, not the actual

5  representatives who were working on behalf of the government.

6       So, your Honor, this is extraordinarily serious

7  conduct as reflected in the charges.  The evidence here is

8  exceptionally strong.  This was a case in which the government

9  was using confidential sources and, therefore, was recording

10 many of these meetings, and so the evidence will show the

11 defendant participated in these meetings, and the jury will get

12 to hear his words as he participated and as he agreed to

13 conduct these transactions.

14      So, in a way, your Honor, the case is somewhat

15 complicated in that it touches on some interesting

16 international issues, but, in many ways, this case is simple —

17 it is a narcotics case in which the defendant agreed on tape to

18 send thousands of kilograms of cocaine to the United States,

19 and in doing so, violated the narcotics laws.  So the defendant

20 is certainly a danger to the community.

21      With respect to risk of flight, your Honor, I believe

22 that that is really the basis that the government would

23 emphasize most to the Court.  The basis for that is that the

24 defendant is not a citizen of the United States.  Indeed, he

25 was not even a resident of the United States.  The defendant

KBHKYOUN

1    was living in this country and left this country in 1991 to go

2    back to Bogotá, as reflected in the pretrial services report.

3          And, your Honor, it appears that at that same time,

4    the defendant, in 1991, was arrested for driving without a

5    license, I believe, and never showed up to court for that

6    citation, and that's on page 3 of the report. And, instead, he

7    left and went to Bogotá, where he then lived until he was

8    extradited just recently.

9          Your Honor, because he was extradited and was living

10   in Colombia up until his time coming back to this district,

11   it's the government's belief that there is an exceptionally

12   strong reason to believe that the defendant will do what he can

13   to depart this country and leave these charges unanswered in

14   this district. The reason for that is that the defendant has

15   no reason to stay here. If he were to ultimately be convicted,

16   he's facing the ten-year mandatory minimum sentence in this

17   case, and then he's facing deportation back to Colombia, where

18   he is a citizen.

19         So if the defendant stays to answer the charges here,

20   he would be doing so only to face a ten-year sentence and end

21   up in the same place he would be if he were to flee, which was

22   Colombia. It's the government's submission that there are no

23   ties to this community, the one in the Southern District of New

24   York, and while he does have family residing in Florida, he

25   will not be able to spend time with that family, whether he

1  goes to jail first and then has to end up back in Colombia or

2  whether he simply flees to Colombia from the Middle District of

3  Florida.

4          And, your Honor, because it is a presumption case,

5  because the government believes the defendant is a danger to

6  the community and a risk of flight, we would submit that

7  detention is appropriate.

8          THE COURT:  Mr. Yannella?

9          MR. YANNELLA:  Judge, I would just point out that the

10  narrative given by the prosecutor doesn't say a whole lot more

11  than what is in the indictment, and that is that he --

12          THE COURT:  Well, I disagree.  In terms of the

13  strength of the case, there is a strong case because the

14  defendant is on tape negotiating huge kilograms -- that's the

15  government's case, I have to accept their proffer --

16  negotiating multi-thousands of kilograms of transactions of

17  cocaine from Colombia to the United States.

18          MR. YANNELLA:  But without one example of what he

19  supposedly said.  So we already knew coming in here, from the

20  indictment and the press release, that he was present at

21  meetings, and he supposedly agreed to import narcotics into the

22  United States, but in these types of cases involving law

23  enforcement and drug cartels in South America — and I have been

24  involved in these cases before — sometimes narcotics

25  transactions are discussed because there often is corruption

1    either in law enforcement, or in the military, or among the

2    politicians, but that doesn't mean that every individual at the

3    meeting actually agreed to what was being said.

4            So we're being told that he attended the meeting, but

5    we don't know how many people were present at the meeting.

6    We're being told that he agreed or he negotiated, but we're not

7    being told what he said.  So what I'm saying is that it doesn't

8    add a lot more.  There are often potentially issues of

9    entrapment in cases like this, there are issues about whether

10   everyone who's present at the meeting really knowingly and

11   intentionally joined the conspiracy.

12           (Pause)

13           THE COURT:  That may be, Mr. Yannella, but you're not

14   in a position at this point to proffer whether that's the case

15   in this particular case, right?

16           MR. YANNELLA:  That's correct.

17           THE COURT:  So what I've got is it's a presumption

18   case.  Based on the government's proffer, it is a strong case.

19   We've got someone who is not a citizen and who's associated

20   with an organization that has more than the capacity to make

21   good on the bail if he were to jump bail.

22           MR. YANNELLA:  But he'd be ruining the financial life

23   of his two daughters.

24           THE COURT:  But he could make that up.  I mean, he's

25   only ruining it to the extent that he doesn't pay whatever

1  they've committed to pay.  And someone who's brokering

2  thousands of kilos of cocaine has the capability of doing that.

3  All of his ties are in Colombia other than his daughters.  His

4  brothers and sisters, his wife, right, everybody's in Colombia

5  except these two children?

6           MR. YANNELLA:  Yes, the pretrial --

7           THE COURT:  In '91, facing really minor charges,

8  unless there was something else going on that he was concerned

9  was going to come out by virtue of his being arrested for

10 driving without a license, he gave up permanent residence to

11 return to Colombia, which is --

12          MR. YANNELLA:  That's correct, your Honor.

13          THE COURT:  -- which is unusual.

14          MR. YANNELLA:  Well, not necessarily.  Some people are

15 from Colombia, and they embrace being from Colombia, and they

16 want to live there because their parents and other family

17 members are there.

18          THE COURT:  Of course, but they don't usually go to

19 the trouble of getting a green card.  That's my only point.  In

20 my experience, it is unusual for someone, having jumped through

21 every hoop you've got to jump through to get a green card, to

22 give it up based on nothing that I can see other than a minor

23 arrest.

24          MR. YANNELLA:  Okay, I understand your point now.

25          THE COURT:  That's my only point.

1    So, Mr. Yannella, I'm going to reject your motion for

2    bond without prejudice to re-up it if some of the things that

3    you've suggested, upon review of the evidence, you can proffer;

4    that is, yes, they have tapes, but my guy is sitting in the

5    corner saying nothing, or whatever, but for now, I don't think

6    you've overcome the presumption, which is, this man is a

7    foreign national, looking at a lot of time with very serious

8    charges, and limited ties to the U.S., and to the extent he

9    does have ties, based on the organization that he's associated

10   with, he could make good on any financial loss that he would

11   cause to his suretors.  So those are my concerns.  But, again,

12   this is without prejudice after you've actually had a chance to

13   look at the evidence.

14       As for all of the difficulties in consulting with your

15   client in Westchester, I guess what I'll ask you to do is this:

16   Continue to try to work through the problems, including with

17   the legal staff up in Westchester.  I confess that without

18   having heard from them, it strikes me as peculiar that they're

19   unwilling to allow a telephone connection to an interpreter

20   when you're having a videoconference, because that would

21   certainly facilitate things.  If you ultimately cannot work out

22   a workable solution with Westchester, let me know, and I will

23   direct that your client be moved from Westchester to either MCC

24   or MDC --

25       MR. YANNELLA:  Thank you.

KBHKYOUN

1    THE COURT:  -- where things are obviously easier, but

2    they have -- there are a whole other set of downsides to MCC

3    and MDC.

4    MR. YANNELLA:  It seems to me a reasonable solution

5    would be to allow me to have a privileged phone call from my

6    mobile phone, and then I could bring the interpreter in --

7    THE COURT:  Three-way them in?

8    MR. YANNELLA:  Three-way the interpreter in, and we

9    could discuss the case.

10    THE COURT:  See what you can do in working through

11    these problems with Westchester.  That's a new one to me.  I

12    had not heard that they're not allowing privileged calls other

13    than to a landline and an office.

14    MR. YANNELLA:  Yes, I got that in an email from the

15    staff, but I will follow up by myself.

16    THE COURT:  Okay.

17    Anything further from the government?

18    MR. WIRSHBA:  Your Honor, I believe time is already

19    excluded to December 4th.

20    THE COURT:  It's not even running.  You've got a

21    fugitive.

22    MR. WIRSHBA:  I'm sorry, yes, your Honor, right.

23    Which you covered at the beginning, yes, your Honor.

24    THE COURT:  Anything further, Mr. Yannella?

25    MR. YANNELLA:  Could I just speak briefly with my

KBHKYOUN

1   client when the court appearance is done?

2          THE COURT:  Yes.

3          Could you leave him in the courtroom for just a

4   second?

5          Yes.

6          MR. YANNELLA:  Thank you.

7          THE COURT:  Okay.  Thank you.

8          MR. WIRSHBA:  Thank you, your Honor.

9                              *  *  *

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25